UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| SANDRA DER and GORDON DER, individually and as parents and natural guardians for G.D., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>SEAN CONNOLLY, in his individual and official capacity; MIKE AMMEND, in his individual and official capacity; and ISANTI COUNTY,<br><br>Defendants. | Case No. 08-CV-6409 (PJS/JJG)<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

---

Joseph J. Walsh and Richard W. Curott, CUROTT & ASSOCIATES, LLC, for plaintiffs.

Jason M. Hiveley, IVERSON REUVERS, LLC, for defendants.

Plaintiffs Sandra Der ("Sandra"), her husband Gordon Der ("Gordon"), and their five-year-old son, G.D., bring this action against defendants Isanti County, Sheriff Mike Ammend, and Deputy Sheriff Sean Connolly. This action arises out of Connolly's warrantless entry into the Ders' home on the evening of April 22, 2008. Plaintiffs bring this action under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments. Plaintiffs also assert a host of state-law claims, including assault, battery, intrusion upon seclusion, false arrest, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress.

This matter is before the Court on defendants' motion for summary judgment on all of plaintiffs' claims and on plaintiffs' motion for partial summary judgment on their claim that Connolly's warrantless entry violated the Fourth Amendment. For the reasons stated below, the

Court grants defendants' motion with respect to (1) plaintiffs' Fourteenth Amendment claims against all defendants and (2) plaintiffs' Fourth Amendment claims against the County and Ammend. The parties' motions are denied in all other respects.

I.  BACKGROUND

Sandra, Gordon, and G.D. live in Princeton, Minnesota. At the time of the events giving rise to this lawsuit, Sandra's teenaged son from a previous marriage, R.D., lived with the Ders. On the afternoon of April 22, 2008, R.D. came home from school and, according to R.D., found his mother drunk and lying on the sofa. R.D. Aff. ¶ 4. (Sandra denies that she was drunk and instead claims that she had had consumed only two or three ounces of wine. S. Der Dep. 69, 101, 107.) R.D. claims that Sandra yelled at and insulted him. R.D. Aff. ¶¶ 4, 7. (Sandra denies yelling at R.D. S. Der Dep. 57.)

R.D. left the house and called Terry Darby ("Terry"), his father and Sandra's ex-husband, to pick him up. R.D. Aff ¶¶ 8, 10. R.D. told Terry and his father's new wife, Heather Darby ("Heather"), that his brother G.D. was sick and that R.D. wasn't sure that his mother was able to take care of G.D. due to her intoxication. R.D. Aff. ¶ 9. G.D's father Gordon, an over-the-road truck driver, was away from home at the time. S. Der Dep. 25, 31-32.

Heather called 911 to ask the police to conduct a welfare check on G.D. Walsh Suppl. Aff. Ex. 1, Track 1 (recording of Heather's 911 call). In response, Connolly arrived at the Der home shortly after 9:00 p.m. Connolly Dep. 34-35. Sandra was on the phone with Gordon when Connolly arrived. S. Der Dep. 115. Before answering the door, Sandra put the phone in her pocket but did not disconnect the call. S. Der Dep. 117-18, 136. At this point, the parties' accounts of events diverge drastically. For example:

According to Sandra, Connolly banged on the door and identified himself as a truant officer. S. Der Dep. 114-15. Sandra put on a robe and came to the door within two minutes. S. Der Dep. 115-16; S. Der Aff. ¶ 3. Looking through the peephole, Sandra saw a man in a uniform. S. Der Dep. 117. Connolly told her to open the door, and Sandra replied that she didn't have to open the door until she found out who he was. S. Der Dep. 117. (Sandra's reluctance to open the door to a stranger after dark is understandable given that the Der home is situated on fifteen acres of land and is set back about sixty feet from the road. S. Der Dep. 8.) Connolly responded, "Open up, or I'll kick the door in." S. Der Dep. 118. As Sandra started to open the door, the Ders' two dogs tried to get out. S. Der Dep. 118. Sandra pushed them back with her foot and began closing the door. S. Der Dep. 118, 132. At the same moment, Connolly wedged his foot against the door and, without attempting any further communication, grabbed Sandra's wrist, spun her around, and forced her about six feet into the entryway. S. Der Dep. 118, 120. The dogs began jumping around with excitement, and Connolly threatened to shoot them. S. Der Dep. 124. At no time did Sandra swear, raise her voice, or act belligerent. S. Der Dep. 132; S. Der Aff. ¶ 6.

Connolly tells a very different story. According to Connolly, he had to knock on the door for five to eight minutes before Sandra finally yelled "What? Knock it off." Connolly Dep. 35. Connolly announced that he was from the sheriff's office. Connolly Dep. Ex. 3. Sandra then opened the door in an aggressive manner. Connolly Dep. 35. Connolly noticed that Sandra smelled strongly of alcohol and had bloodshot, watery eyes. Connolly Dep. 35. (Sandra denies that she smelled of alcohol or had bloodshot, watery eyes. S. Der. Aff. ¶¶ 4-5.) Connolly explained that he was there to check on her and her children's well-being. Connolly Dep. 35.

Sandra started to slam the door, but Connolly blocked it. Connolly Dep. 87. Connolly asked Sandra to step outside, at which point Sandra again attempted to slam the door, and Connolly again prevented her from doing so. Connolly Dep. 87. Sandra became belligerent and began swearing at Connolly. Connolly Dep. 36. Connolly took hold of Sandra's wrist and was attempting to pull her outside when the Ders' dogs appeared and began barking and growling. Connolly Dep. 36. Connolly let go of Sandra and told her to put the dogs away. Connolly Dep. 36. Sandra initially refused, but eventually put the dogs downstairs after Connolly warned her that they might be harmed. Connolly Dep. 37. Connolly asked about G.D. and suggested that they go together to check on him. Connolly Dep. 37. Sandra then gave Connolly permission to come inside the house. Connolly Dep. 37. Connolly denies forcing his way into the house or otherwise entering the house without permission. Connolly Dep. 37.

The parties also dispute what happened once Connolly was inside the Ders' home. For example, Sandra claims that Connolly forced her to wake G.D., take his temperature (which was 100.9 degrees), and give him Tylenol. S. Der Dep. 126. According to Connolly, G.D. was awake when Connolly entered the home. Connolly admits that he asked Sandra to take G.D.'s temperature and give him Tylenol, but Connolly claims that G.D had a fever of 102.9 degrees. Connolly Dep. 37-38.

There is also some dispute about Sandra's blood-alcohol level. Connolly claims that he tested it and found it to be .20. Connolly Dep. 39. Sandra contends that Connolly claimed that her blood-alcohol level was .20 before he tested it. S. Der Dep. 137. Sandra says that she insisted that Connolly test her blood-alcohol level — presumably to prove that she was sober.

According to Sandra, when Connolly finally did so, he announced that her blood-alcohol level was .20 and then quickly turned off the display before Sandra could see it. S. Der Dep. 134.

At some point after checking on G.D., Connolly handcuffed Sandra. According to Connolly, he did so after Sandra began yelling at him and said, among other things, that she would have shot Connolly if he had entered the home without her permission. Connolly Dep. 41. Connolly also claims that Sandra resisted his attempts to handcuff her. Connolly Dep. 175-77. Sandra denies this account. She claims that, without warning, Connolly grabbed her from behind and handcuffed her after she refused to hang up on her husband. S. Der Dep. 136-37, 139-41.

Connolly eventually left after Gordon arranged for relatives to help care for G.D. S. Der Dep. 147-48; M. Der Dep. 11-12, 22. Sandra claims, though, that before Connolly left the home, he called Sandra a chronic drunk, threatened to take G.D. away, told G.D. that Sandra had threatened to shoot him, and asked G.D. about guns in the home. S. Der Dep. 144-45.

Needless to say, Connolly's account and Sandra's account conflict dramatically — so dramatically that the conflict cannot be attributed solely to variations in the way two persons perceive or remember an event. Quite clearly, Connolly, Sandra, or both are perjuring themselves in this lawsuit. For present purposes, though, what matters is that it is for the jury, and not for this Court, to decide what is true. Because the Court cannot resolve the parties' numerous and dramatic factual disputes, the Court obviously cannot grant summary judgment to either side on any claim, with just a couple of exceptions.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Fourth Amendment Claims Against Connolly

#### 1. Entry into the Ders' Home

The Ders claim that Connolly violated the Fourth Amendment by entering the Der home without a warrant and by using excessive force. The Ders move for summary judgment on this claim; Connolly also moves for summary judgment, on the basis of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A police officer who is acting as a "community caretaker," as Connolly was when he went to the Ders' home, may enter a residence without a warrant if he or she has "a reasonable belief that an emergency exists requiring his or her attention." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). This is a less exacting standard than probable cause. *Id.* Connolly argues that, under this standard, he was justified in entering the Der home and in using force to do so. Although Connolly admitted at his deposition that he did not consider the situation to be an emergency before he arrived at the Der home, he argues that Sandra's behavior at the door gave rise to a reasonable belief that an emergency existed. Specifically, Connolly points to the excessive length of time it took Sandra to answer the door; Sandra's belligerence when she finally answered it; the fact that Sandra smelled of alcohol and had bloodshot, watery eyes; and Sandra's attempt to shut the door after he explained why he was there.

If Connolly's version of the facts were true, the Court would likely agree that he is entitled to qualified immunity. (For this reason, the Court denies plaintiffs' motion for summary judgment on their claim of unlawful entry.) *Cf. Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998) (officers reasonably concluded that plaintiff's grandmother was in need of immediate aid in light of several factors, including plaintiff's lack of cooperation with officers). The problem with Connolly's argument, though, is that it depends almost entirely on his version of the facts. Sandra denies that Connolly explained why he was there or that he identified himself as a sheriff's deputy. Sandra also denies that she was belligerent, smelled of alcohol, or had bloodshot, watery eyes. Instead, according to Sandra, after she opened the door Connolly almost immediately grabbed her, spun her around, and shoved her six feet into her house without making any attempt to explain his presence. True, Sandra admits trying to close the door without

explaining that she was trying to keep her dogs from going outside. But that alone cannot justify Connolly's use of force to effect a warrantless entry before Connolly even explained why he was there. If Sandra's description of Connolly's behavior is true, Connolly's entry into the home plainly violated the Fourth Amendment and any reasonable officer would have known as much. Connolly's motion for summary judgment on these claims is denied.

2. Handcuffing Sandra

Plaintiffs claim that Connolly violated the Fourth Amendment by handcuffing Sandra both because it was an unlawful seizure and because Connolly used excessive force. According to Connolly, the seizure was proper because Sandra was drunk, hostile, and belligerent, and because Sandra refused to hang up the phone when directed to do so. Under these facts, Connolly argues, he was justified in handcuffing Sandra to ensure her and others' safety. *See Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001) (noting that a police officer may properly seize a person to ensure the safety of the public or the individual regardless of any suspected criminal activity). Moreover, Connolly argues, his minimal use of force was justified because Sandra resisted his attempts to handcuff her.

As with plaintiffs' other Fourth Amendment claims, Connolly largely relies on his own version of the facts to argue that he is entitled to qualified immunity. He ignores that Sandra denies being drunk, denies acting belligerent, and denies raising her voice at any time before Connolly handcuffed her. He also ignores that, in Sandra's version of the incident, he came at her without warning and quickly yanked her hands behind her back without any resistance on her part. If Sandra's version of events is true, Sandra was not posing a danger to herself or to anyone

else and Connolly was not justified in handcuffing her or in using force to do so. Connolly's motion for summary judgment on these claims is denied.

C. *Fourteenth Amendment Claims Against Connolly*

Plaintiffs next claim that Connolly unconstitutionally interfered with their familial relationships by (1) ordering Sandra to give G.D. Tylenol; (2) telling G.D. that Sandra had threatened to shoot Connolly with a gun; (3) telling G.D. that Sandra is a chronic drunk; (4) threatening to take G.D. away from his parents; and (5) questioning G.D. about the location of any guns in the Der home. *See* Docket No. 93 at 13. Plaintiffs bring this claim under the Due Process Clause of the Fourteenth Amendment, which protects the liberty interest that parents and children have in each other's companionship as well as the liberty interest that parents have in the care, custody, and management of their children. *Whisman ex rel. Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997) ("Both parents and children have a liberty interest in the care and companionship of each other."); *King v. Olmsted County*, 117 F.3d 1065, 1067 (8th Cir. 1997) ("We have recognized a right to familial relations, which includes the liberty interest of parents in the custody, care, and management of their children.").[1]

---

[1]The parties' briefing on these claims is somewhat sparse and, aside from the allegation about Tylenol, it is not entirely clear how plaintiffs are claiming that their rights were infringed by Connolly's actions. As best the Court can tell, plaintiffs appear to be claiming that Connolly damaged G.D.'s relationship with Sandra by saying or implying disparaging things about her.

Plaintiffs also argue that Connolly violated the Fourteenth Amendment by forcibly entering the Ders' home without stating the reason for his presence. Docket No. 93 at 22-23. Because this claim arises under the Fourth Amendment, it must be analyzed under Fourth Amendment principles and cannot be brought as a substantive-due-process claim. *Cf. Graham v. Connor*, 490 U.S. 386, 394-95 (1989) (holding that the validity of an excessive-force claim must be analyzed with reference to the specific constitutional standard that governs the right at issue rather than the more generalized rubric of substantive due process).

"To determine whether a violation of an individual's substantive due process rights has occurred, the question is whether the officials acted in an arbitrary or capricious manner, or so as to shock the conscience." *Herts v. Smith*, 345 F.3d 581, 587 (8th Cir. 2003). In cases dealing with allegedly abusive executive action, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense . . . .'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Such a high standard is necessary "lest the Constitution be demoted to . . . a font of tort law." *Id.* at 847 n.8.

Assuming that Connolly's act of directing Sandra to give Tylenol to G.D. was a constitutional violation, Connolly is entitled to qualified immunity under the circumstances of this case. *See Pearson*, 129 S. Ct. at 818 (holding that courts may decide whether a defendant is entitled to qualified immunity without first deciding whether the defendant violated the plaintiff's rights). There is no dispute that G.D. was ill and running a high fever — nearly 101 degrees (as Sandra would have it) or nearly 103 degrees (as Connolly would have it). Although the parties dispute whether Sandra was drunk and whether she behaved belligerently, there can be no dispute that Connolly had an objectively colorable basis for doubting Sandra's ability to care for G.D. It is undisputed that Connolly was in the Der home because of a phone call in which the sheriff's office was told that Sandra "drinks quite a bit" and that Sandra's teenage son had left the home because his mother was "really drunk." Walsh Suppl. Aff. Ex. 1, Track 1 (recording of Heather's 911 call). And plaintiffs do not claim that Sandra in any way objected to Connolly's direction that she give Tylenol to her feverish son. Under these circumstances, it would not be clear to a reasonable officer that telling Sandra to give Tylenol to G.D. would rise to the level of a constitutional violation.

Connolly is also entitled to qualified immunity with respect to plaintiffs' claim that Connolly violated their constitutional rights by telling G.D. upsetting and disparaging information about Sandra. "'Fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest.'" *King*, 117 F.3d at 1067 (quoting *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991)); *see also Pittsley*, 927 F.3d at 5-7 (holding that officer's threat to young children that they would never see their stepfather again, refusal to allow the children to hug and kiss their stepfather goodbye, and use of vulgar language in front of the children, did not shock the conscience).

To constitute an actionable constitutional violation, the threat or harassment must be "so brutal or wantonly cruel as to shock the conscience . . . ." *King*, 117 F.3d at 1067. This is a very tough standard for plaintiffs to meet. *Compare Patel v. Searles*, 305 F.3d 130, 138-40 (2d Cir. 2002) (reversing dismissal of complaint where plaintiff alleged that officers destroyed his family relationships by engaging in extended public campaign of falsely accusing him of murdering his mother and sister, faking evidence to link him to the murders, and falsely telling his wife that her life was in danger) *and Burton v. Livingston*, 791 F.2d 97, 99-101 (8th Cir. 1986) (finding due-process violation where officer pointed a cocked pistol at plaintiff and said "nigger run so I can blow your Goddamn brains out, I want you to run so I'll be justified") *with Griffin v. Strong*, 983 F.2d 1544, 1548-49 (10th Cir. 1993) (finding no due-process violation where officer falsely informed wife that her husband had confessed to child abuse) *and Hopson v. Fredericksen*, 961 F.2d 1374, 1378-79 (8th Cir. 1992) (distinguishing *Burton* and finding no due-process violation

where officer threatened to knock out plaintiff's teeth, but did not threaten to kill plaintiff and never brandished a lethal weapon).

In light of this case law, the Court finds that it is not clearly established that statements of the nature of those allegedly made by Connolly to G.D. (or within earshot of G.D.) — statements that were undoubtedly improper and unprofessional and perhaps even tortious — were "so brutal or wantonly cruel as to shock the conscience . . . ." *King*, 117 F.3d at 1067. Connolly is therefore entitled to qualified immunity on plaintiffs' Fourteenth Amendment claim.

### D. Constitutional Claims Against Ammend and the County

Plaintiffs seek to hold both Ammend and the County liable for Connolly's alleged constitutional violations.[2] Plaintiffs claim that Ammend is liable in his individual capacity because he failed to train or supervise Connolly in any way. *See Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010) (to hold an official personally liable for failure to train or supervise, a plaintiff must show that the official was deliberately indifferent to the need for training or supervision). Plaintiffs point out that Ammend testified that he did not train or supervise Connolly directly, but instead delegated that duty to the chief deputy, Russell Monson. Ammend Dep. 16-17. Plaintiffs claim that Monson did not supervise Connolly and disclaimed any such duty. Because no one supervised or trained Connolly, plaintiffs argue, Ammend was deliberately indifferent to plaintiffs' constitutional rights.[3]

---

[2] Plaintiffs sued Ammend in both his individual and in his official capacity. An official-capacity claim against Ammend is simply another form of action against the County. *See Rogers v. City of Little Rock*, 152 F.3d 790, 800 (8th Cir. 1998).

[3] Plaintiffs also claim deliberate indifference because Ammend apparently was not familiar with a state statute that, according to plaintiffs, allows a parent to prevent a law-
(continued...)

Plaintiffs' argument is based on a misstatement of the record. Monson testified that he supervised sergeants, and that those sergeants were, in turn, responsible for supervising deputies. Monson Dep. 7. If a sergeant was not available, however, Monson would supervise the deputies himself. Monson Dep. 7-8. With respect to training, nowhere does Monson disclaim responsibility for training deputies; to the contrary, Monson specifically noted that his job duties included training employees. Monson Dep. 7. Ammend also testified that Monson spoke to officers who were having problems and handled complaints against officers by talking to the complainant and the officer. Ammend Dep. 20, 45-46. Other than their claim that no one supervised or trained Connolly — a claim that is demonstrably untrue — plaintiffs offer no basis on which to hold Ammend personally liable for Connolly's alleged constitutional violations. The Court therefore grants defendants' motion with respect to all constitutional claims against Ammend.[4]

In order to hold the County liable, plaintiffs must show that the County caused Connolly's alleged constitutional violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Plaintiffs claim that the County caused the violations because it lacked policies

---

[3](...continued)
enforcement officer from speaking to a child unless the law-enforcement officer first obtains a court order to the contrary. *See* Minn. Stat. § 626.556, subd. 10(e)-(f). Setting aside plaintiffs' extremely dubious reading of this statute, Ammend's lack of familiarity with a *state* statute is irrelevant to whether Ammend was deliberately indifferent to plaintiffs' *federal* constitutional rights. *See Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998) (violations of state law, without more, do not violate the federal constitution).

[4]Ammend did not move for summary judgment on the basis of qualified immunity. Had he done so, the Court would have dismissed plaintiffs' constitutional claims against him on that basis as well. *Cf. Parrish*, 594 F.3d at 1001-03 (plaintiff's supervisory-liability claim against sheriff was barred by qualified immunity despite the fact that the officer under the sheriff's supervision was given virtually no training whatsoever).

regarding (1) the responsibility for training or supervising its employees; (2) entry into a private home; and (3) performing child-welfare checks.

The failure to have a policy does not give rise to municipal liability unless such failure reflects a deliberate indifference to the citizenry's constitutional rights. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007) (en banc) ("As we have explained, however, a written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability."). In most cases, a plaintiff can show deliberate indifference only by proving the existence of a history or pattern of constitutional violations such that the need for additional training or more detailed policies was obvious. *Cf. id.* at 392-93. But an isolated incident of a constitutional violation may trigger municipal liability if "the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Id.* at 393 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

Here, plaintiffs do not claim that either Connolly specifically[5] or County employees generally had committed so many violations of the Fourth or Fourteenth Amendments that the

---

[5]Plaintiffs offer evidence of an incident in which Connolly allegedly entered a private home, chased the homeowner to her bedroom, handcuffed her, and falsely claimed that she was drunk. But this incident occurred in August 2009, well over a year *after* the incident at issue in this case. *See* Walsh Suppl. Aff. ¶ 11. It is thus irrelevant to the issue whether the County was deliberately indifferent to a need for greater training or supervision of Connolly in April 2008.

The Court also notes that the record contains references to an incident in which Connolly, while moonlighting as a security officer for a festival in the city of Isle, got into an altercation with the mayor of Isle. Plaintiffs do not mention this incident in their briefing and, given that this incident did not involve entry into a home or a child-welfare check, it would not have put the County on notice that Connolly required more training in these areas.

need for additional training was obvious to the County. Instead, plaintiffs seem be claiming that the lack of formal policies regarding entry into private homes or conducting child-welfare checks will obviously and inevitably lead to constitutional violations. In this case, though, there is undisputed evidence that Connolly did receive training in constitutional law. Connolly Dep. 116. The County's decision to rely on that training, rather than adopting a specific policy, does not reflect deliberate indifference to constitutional rights.

Likewise, plaintiffs do not explain why there is so great a potential for constitutional violations in connection with child-welfare checks — as compared to any other circumstance in which an officer may enter a private home or use force against a member of the public — that the failure to have a specific policy regarding child-welfare checks betrays deliberate indifference to constitutional rights. An officer will have occasion to enter private homes or use force under many and varied circumstances. The County need not — indeed, *could* not — have a policy describing exactly how and when an officer may enter a home or use force under every possible circumstance. Plaintiffs have not explained why child-welfare checks should be singled out for special treatment, especially given the lack of evidence that a County employee has ever before been accused of violating the Constitution during such a check.

Finally, with respect to plaintiffs' complaint that the County failed to adopt policies regarding the training or supervision of employees: As discussed above, the Court has already concluded that plaintiffs cannot show that Ammend failed to adequately train or supervise Connolly. With that in mind, plaintiffs cannot show that the County's failure to adopt a formal *policy* regarding the training or supervision of officers amounted to deliberate indifference. The

Court grants defendants' motion for summary judgment with respect to all constitutional claims against the County.

### E. State-Law Claims

As noted, plaintiffs also bring a number of state-law claims, including assault, battery, intrusion upon seclusion, false arrest, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress.[6] It may be that, after hearing the evidence at trial, the Court will be in a position to grant a motion for a directed verdict with respect to some of plaintiffs' state-law claims. At this point, however, it is best to leave those claims for trial, as their resolution largely turns on disputed factual issues that will have to be resolved by a jury in connection with plaintiffs' constitutional claims.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion for summary judgment [Docket No. 77] is DENIED.

2. Defendants' motion for summary judgment [Docket No. 84] is GRANTED IN PART and DENIED IN PART.

3. Defendants' motion is GRANTED with respect to:

   a. Plaintiffs' Fourteenth Amendment claims against all defendants, and

   b. Plaintiffs' Fourth Amendment claims against defendants Mike Ammend and Isanti County.

---

[6] At oral argument, plaintiffs clarified that they are not asserting any claims under the state constitution. The Court also notes that plaintiffs do not appear to be asserting any state-law claims against Ammend.

4. Defendants' motion is DENIED in all other respects.

Dated: June 11, 2010						s/Patrick J. Schiltz
									Patrick J. Schiltz
									United States District Judge